AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF THE | ) | Case No. 4:20 MJ 163 DDN |
| PREMISIS LOCATED AT: | ) | *Signed and Submitted to the Court for* |
| **3400 GOODFELLOW BOULEVARD, ST.** | ) | *filing by reliable electronic means* |
| **LOUIS, MO 63120** MORE FULLY DESCRIBED | ) | |
| IN ATTACHMENT A. | ) | **FILED UNDER SEAL** |

## APPLICATION FOR A SEARCH WARRANT

I, _____Megan Schira_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**3400 GOODFELLOW BOULEVARD, ST. LOUIS, MO 63120** MORE FULLY DESCRIBED IN ATTACHMENT A.

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;
✓ contraband, fruits of crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, USC Section 841(a)(1), 846 | Conspiracy to distribute controlled substances |
| Title 21, USC Section 843(b) | Unlawful use of a communication facility |
| Title 18, USC Section 1956 | Money Laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Megan Schira Special Agent, FBI

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41 on this _____30th_____ day of June, 2020.

Date: _____June 30, 2020_____

**/s/ David D. Noce**

*Judge's signature*

City and State: _____St. Louis, MO_____

Honorable David D. Noce, U.S. Magistrate Judge
*Printed name and title*
AUSA:   Derek J. Wiseman

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Megan Schira, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND:

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Bureau of Investigation Rules of Criminal Procedure for a warrant to search the premises known

as **3400 Goodfellow Blvd., St. Louis, MO 63120,** and **5051 Mardel Ave. (right door/2nd floor),**

**St. Louis MO 63109** (hereinafter the "Premises") further described in Attachment A, for the things

described in Attachment B.

2.      I am a Special Agent ("SA") with the FBI, and have been since 2015. I am an

investigative or law enforcement officer of the United States within the meaning of Section

2510(7) of Title 18, United States Code, and I am empowered by law to conduct investigations of

and to make arrests for the offenses enumerated in Title 18, United States Code, Section 2516. I

have been employed as a SA of the FBI for approximately four years.  Prior to becoming a SA

with the FBI, I was an intelligence analyst with the United States Army for approximately four (4)

years.  I am currently assigned to a squad responsible for the investigation of drug trafficking,

crimes of violence, and violent street gangs.  Through my training and experience, I am familiar

with the debriefing of cooperating witnesses and/or other sources of information and methods of

searching locations where illegal drugs, firearms, instruments of money laundering, and evidence

of other crimes may be found.  I have been trained in and have experience conducting surveillance

of drug traffickers.  I am also familiar with the methods used to import illegal drugs and firearms.

I have also interviewed persons involved in violations of federal law pertaining to firearms and

drug trafficking.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. The statements contained in this affidavit are based in part on information and written reports provided by other law enforcement investigators; information gathered from the service of subpoenas; the results of searches, seizures, and surveillance conducted by FBI, and/or other law enforcement agencies; telephone call records and pen register information; consensually recorded telephone calls; information gathered from cooperating witnesses; and on my experience and the experience and background of other law enforcement officers. As part of the investigation described in this affidavit, I have reviewed public and law enforcement records and talked with or reviewed reports of other law enforcement investigators. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.     Presently, I am part of a team of experienced law enforcement detectives/agents/officers/analysts, which have been investigating the criminal activities of a drug trafficking organization that has been identified as operating in a conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), unlawful use of a communication facility, in violation of Title 21, United States Code, Section 843(b), and money laundering, in violation of Title 18, United States Code, Section 1956 (hereafter "**subject offenses**"). The investigation reflects that the enterprise is comprised primarily of persons who are friends and associates of **HARVEY BUTLER** (BUTLER) a/k/a "H", "BOSS MAN", including LAQUISHA JONES a/k/a "QUISHA", MICHAEL SHEVLIN a/k/a "MIKE", JERRY NELSON, JAMES HALL a/k/a

2

"ROCK", and others.  It is the investigative team's opinion as experienced investigators, that there is probable cause for a search warrant for the two locations described in Attachment A for evidence of the **subject offenses** and contraband or fruits of those crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED

5.      This affidavit is submitted in support of an application for the issuance of federal search warrants for the following two locations, both of which are located in the Eastern District of Missouri:

6.      **Subject Property #1:** 3400 Goodfellow Blvd. St. Louis, MO 63120, which is more fully described as a large auto shop building located on the east side of Goodfellow Blvd. There is a parking lot located to the north of the building. The building has a gray exterior with a red portion on the roof. There are multiple access points to the building, including multiple garage doors on the north side of the building and a door on the west side of the building with access to a small convenience store. Located on the north side of the building is the following: NEIGHBORHOOD AUTO SALES & SERVICES LLC 314-240-5950. Located on the west side of the building in large letters is NEIGHBORHOOD CONVEINIENCE L.L.C. Ameren records identified that utilities for 3400 Goodfellow have been listed under NEIGHBORHOOD CONVENIENCE SERVICES since October of 2017. The phone number associated to the Ameren account is (314) 240-5950 and the email is royaltybutters@gmail.com. Missouri Business records revealed that BUTLER is the registered agent for Neighborhood Convenience Services LLC, at 3400 Goodfellow Blvd, Saint Louis, MO 63112 (**Subject Property #1**). The totality of the pending investigation indicates that this is the primary business utilized by BUTLER to distribute narcotics and likely launder proceeds from narcotic transactions.

3

7.      **Subject Property #2:** 5051A Mardel Ave., St. Louis, MO 63109, which is more fully described as the upstairs apartment within a two family flat along with a detached garage. The residence is described as a red brick house on the north side of Mardel Avenue. When viewed from Mardel Avenue, the residence has a large stone patio with two blue front doors. There is a side door on the west side of the residence with access to two apartments: one on the main level and one on the second level. The blue door on the right side (east side) of the residence has stairs to the second floor. Furthermore, "5051A" is in black letters on a gold placard to the left of that door. There is access to a detached garage for 5051 Mardel Avenue in the alley located to the north at the rear of the residence. The number "5051" is located above the garage door in black numbers. It is request that the warrant for this property include the garage, which is used by BUTLER to park his current rental vehicle. The Ameren utility account for the second floor of 5051A Mardel Avenue has been in the business name of Neighborhood Convenience Services since February of 2019. As detailed below, the investigation has shown that BUTLER is utilizing **Subject Property #2** as his primary residence. Investigators believe that, in addition to drug proceeds and evidence of drug trafficking actives, it is likely that business records for BUTLER's businesses, which investigators believe BUTLER is utilizing to launder proceeds of narcotic sales, will likely be located in **Subject Property #2**.

## PROBABLE CAUSE

8.      **HARVEY BUTLER** has been identified as a high-level narcotic dealer, who is distributing cocaine and heroin within the greater St. Louis area.  BUTLER is a subject in a 15-month ongoing investigation involving multiple investigative agencies including SLCPD, FBI, and DEA. The investigation has revealed that BUTLER utilizes his auto shop/convenience store

4

located at **Subject Property #1** to distribute narcotics and investigators believe that BUTLER is also utilizing **Subject Property #1** to launder drug proceeds. This has been corroborated though multiple investigative techniques, including controlled narcotic purchases beginning around April of 2019 using a confidential source (CS). Fixed surveillance has observed that BUTLER routinely arrives at **Subject Property #1** in the morning. Surveillance further reveals that he exits his vehicle, typically carrying a backpack or a satchel, into **Subject Property #1**. In addition, BUTLER generally will remain at **Subject Property #1** throughout the day. He will then typically leave **Subject Property #1** in the evening hours returning to the same vehicle typically with the same backpack or a bag.

9.      As detailed more fully below, the investigation recently identified that BUTLER resides at **Subject Property #2.** As noted above, BULTER will typically arrive and depart from **Subject Property #1** carrying a backpack or satchel. As described below, investigators believe he likely has narcotics and/or proceeds from the sale of narcotics in the backpack and satchel. Through this investigation, BUTLER has been observed traveling from **Subject Property #2** to **Subject Property #1**, where narcotics where sold to a Confidential Source shortly after he arrived. As part of my experience and the training and also the extensive experience of members of the investigative team, we know that it is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control. Drug traffickers typically will not conduct transactions from their stash houses to avoid detection and prevent from being the victim of burglaries. Investigators believe BUTLER is using **Subject Property #2** to store drug proceeds and quantities of narcotics to avoid detection by law enforcement.

10.     Through this investigation, investigators know that BUTLER routinely drives rental vehicles. Investigators believe BUTLER routinely uses the vehicles to transport narcotics and/or proceeds from narcotic transactions to and from his shop at **Subject Property #1**. Based on Confidential Source information and information received from a separate DEA investigation, it is believed that BUTLER is being supplied narcotics from a drug courier with direct ties to individuals in Mexico. Based on Confidential Source information, investigators also believe that BUTLER is using businesses to launder his proceeds and appear legitimate. The information in this instant investigation was corroborated through multiple investigative techniques, including review of police reports, autopsy reports, cell phone analysis, interviews, phone records, surveillance, controlled drug buys, search warrants, and confidential human sources (CS). Investigators believe that BUTLER utilizes rental vehicles to transport narcotics and proceeds to and from locations that he uses to store larger amounts of narcotics, proceeds, and other evidence of his extensive DTO. To date, physical surveillance has identified **Subject Property #2** as a location that investigators believe BUTLER is using to store larger amounts of narcotics, proceeds, and other evidence of his DTO.

11.     On or about January 27, 2019, St. Louis County Police Department (SLCPD) and members of the FBI Safe Streets Gang Task Force (SSGTF) began an investigation into an overdose death. According to the medical examiners report, the pathologist identified the victim's cause of death to be fentanyl and tramadol intoxication. During the course of the investigation, investigators identified JERRY NELSON as the individual who sold the victim fentanyl that resulted in his death. The investigation further revealed that NELSON received the fentanyl from Michael SHEVLIN. This information was corroborated through multiple investigative techniques,

6

including search warrants, confidential sources, phone analysis, interviews, controlled buys, and other investigative techniques. Furthermore, the investigation identified that Michael SHEVLIN was likely being supplied by HARVEY BUTLER.

12.     Additionally, on or about January 21, 2019 (about six days prior to the overdose death), Michael SHEVLIN and James HALL were approached by law enforcement. That day, SHEVLIN was arrested following a search of his person during which time the officers discovered a small clear plastic bag containing an off-white powdered substances. SHEVLIN spontaneously told officers, "It's heroin. I forgot it was on me or I would have dropped it when you pulled up. " The powdered substance was seized and later packaged into evidence. The evidence has been sent to SLCPD Lab for analysis.

13.     Investigators received information from a CS that there had been a second overdose death at BUTLER'S business, **Subject Property #1.** This information was corroborated by a St. Louis Metropolitan Police (SLMPD) Incident Report. According to the report, on March 7, 2019, LAQUESHA JONES contacted emergency services because someone was locked inside a vehicle in the parking lot at **Subject Property #1** and was unresponsive. The vehicle had been delivered by a tow truck the previous day and was owned by Neighborhood Auto Sales, which is the business at **Subject Property #1** registered to BUTLER. The vehicle had been left unlocked overnight but was locked when JONES attempted to wake up the victim. Review of the post-mortem examination revealed the immediate cause of death was heroin and fentanyl intoxication. According to the report, JONES is employed by the business located at **Subject Property #1.**

14.     In March of 2019, a confidential source (CS#1) advised that he/she has known Michael SHEVLIN for several years and is familiar with SHEVLIN selling fentanyl. CS#1 is

7

cooperating with law enforcement in return for considerations from prosecutors related to CS#1's criminal involvement in an ongoing investigation. Information provided by CS#1 has been corroborated, to the extent possible, by business records, physical surveillance, controlled narcotic buys, and conversations. A review of CS#1's criminal history identified prior convictions for charges including possession of controlled substance in 2012 and a fraud offense of deceptive practice in 2010. To date, CS#1 has proven truthful and reliable with investigators during this investigation.

15.     According to CS#1, SHEVLIN owns a construction company named Bi-State Electrical and Construction. CS#1 knew SHEVLIN to have one or two employees, one of which was a black male known to CS#1 as "ROCK," who lived on Dodier Street. CS#1 advised that SHEVLIN would often compensate his employee's with fentanyl instead of money. CS#1 knew SHEVLIN'S phone number to be (314) 320-3843 and thought he possibly lived at 4705 Oldenburg Ave. CS#1 further advised  SHEVLIN was supplied by a guy named "H" (later identified as HARVEY BUTLER). CS#1 knew that "H" owned a convenience store on Goodfellow Avenue near Natural Bridge.

16.     Missouri State Business records revealed that Michael SHEVLIN is the registered agent for TOMCOR, LLC. Subscriber information received from T-Mobile USA, Inc., revealed that telephone number (314)320-3843, the phone number provided by CS#1 for SHEVLIN, is subscribed to BISTATE CONSTRUCTION, at 4705 Oldenburg Ave., Saint Louis MO 63123. Through this investigation, agents identified JAMES HALL as an associate of SHEVLIN's, and revealed that HALL lived at 2713 Dodier St., St. Louis MO. After viewing a photograph of JAMES

8

HALL, CS#1 positively identified HALL as "ROCK." After viewing a photograph of BUTLER, CS#1 positively identified the picture as "H".

17.     According to CS#1, SHEVLIN would receive narcotics from BUTLER at **Subject Property #1** and also at BUTLER's residence, depending on where BUTLER had his narcotics at the time. CS#1 knew BUTLER had moved to **Subject Property #2** from a house in north city because his former residence had been burglarized. CS#1 had assisted SHEVLIN with work around the house for BUTLER shortly after BUTLER moved into **Subject Property #2.**

18.     After the victim's overdose in January of 2019, CS#1 agreed to work proactively with members of the SLCPD and SSGTF. CS#1 was utilized to facilitate the introduction of an SLCPD undercover detective ("UC") to conduct controlled buys of controlled substances from SHEVLIN. In total, the UC participated in six controlled buys of heroin from SHEVLIN between March 2019 and May 2019.

19.     During these controlled buys with the UC, the UC would telephone SHEVLIN to arrange the transaction. After that, SHEVLIN would direct the UC where to meet. The UC would then exchange between $60 to $100 with SHEVLIN or HALL for multiple capsules containing what the UC and CS#1 believed to be fentanyl. The suspected fentanyl was transported to the St. Louis Metropolitan Police Department Laboratory (SLMPD Lab) for analysis. The results identified the narcotic evidence seized from the controlled buys to be heroin with a total weight of 7.47 grams.[1] The controlled transactions occurred at various locations, but one controlled

---

[1] Experienced members of the investigative team know it is common for drug dealers to arrange the sale of one narcotic but actually sell a different narcotic. For example, in the past a CS or UC have believed they are buying heroin, but lab results identified it as fentanyl.

transaction (on April 11, 2019) occurred in the parking lot of **Subject Property #1**. This further corroborated CS#1's information regarding the involvement of **BUTLER**, HALL, and SHEVLIN.

20.     More specifically, on or about April 11, 2019, investigators met at a pre-determined location in anticipation of a controlled narcotic buy with the aforementioned the UC and SHEVLIN. Before the controlled buy, the UC telephoned SHEVLIN at (314)320-3843,[2] known to investigators to be used by SHEVLIN to arrange narcotic transactions. SHEVLIN answered the phone. SHEVLIN then advised UC that he was "good" and directed UC to 3400 Goodfellow, **Subject Property #1**. Prior to the UC departing the staging location, members of the surveillance team established surveillance at **Subject Property #1**. Surveillance observed a white Chevrolet van bearing Missouri license plate D3962 parked at **Subject Property #1**. Surveillance also observed James HALL (a/k/a ROCK) exit the convenience store at **Subject Property #1** and enter the passenger seat of the white Chevrolet van. SHEVLIN was seated in the driver's seat of the van. After UC arrived at **Subject Property #1**, the UC parked near the same van, occupied by HALL and SHEVLIN. Upon arriving in the parking lot, the UC again telephoned SHEVLIN at (314)320-3843 to advise that he/she had arrived. SHEVLIN responded that he was going to have his "partner run it out." HALL then exited the passenger seat of the van and entered the passenger seat of the UC vehicle. Inside the UC's vehicle, the UC provided HALL with $100 in exchange for approximately 14 capsules of what the UC believed to be fentanyl. HALL then exited UC's vehicle

---

[2] On May 1, 2019, the Honorable U.S. Magistrate Judge Noelle C. Collins issued a Precision Location Warrant (PLW) to obtain records, location information including precision location information, cell site information, and other signaling information associated with the cellular telephone having the numbers (314)320-3843. The PLW covered the period from May 1, 2019 to June 14, 2019. *See* Case No. 4:19 MJ 3072 NCC.

and re-entered the passenger seat of the white van. Next, the UC departed the area followed by members of the surveillance team to a pre-determined location, while other members of the surveillance team remained in the area. Shortly after UC departed the area, members of the surveillance team observed both SHEVLIN and HALL exit the van and enter the Neighborhood Convenience Store **(Subject Property #1)**.

21.     This controlled transaction, on or about April 11, 2019, corroborates that SHEVLIN is associated with the Neighborhood Convenience Store **(Subject Property #1)**, which **HARVEY BUTLER** runs. Indeed, SHEVLIN and HALL where involved in the distribution of 1.29 grams of heroin to a UC in the parking lot of **BUTLER'S** auto parts/convenience store at 3400 Goodfellow **(Subject Property #1)**.

22.     On June, 4th, 2019, the Honorable United States Magistrate Judge Nannette A. Baker issued a federal search warrant for SHEVLIN's residence, at 4705 Oldenburg Ave., Saint Louis, Missouri 63123. *See* Case No. 4:19 MJ 5199 NAB. SHEVLIN was present at the time of the execution of the search warrant. Evidence seized during the execution of the search warrant included a small amount of cocaine, marijuana, and a phone associated with SHEVLIN. Initial analysis of SHEVLIN'S phone identified three numbers, including "H", "H New New" and "H Shop". **HARVEY BUTLER** is also known as "H". Experienced members of the investigative team know it is common for drug trafficker to have multiple cell phones in order to compartmentalize their operations and to avoid detection. The number associated with "H Shop" in Shevlin's phone was (314) 240-5950.

23.     Around July of 2019, investigators debriefed CS#2, who advised that he/she knew "H" (later identified as BUTLER) to be distributing heroin, crack cocaine, and weed from his store

11

at 3400 Goodfellow **(Subject Property #1)**. The information provided by CS#2 during this investigation has been highly reliable. CS#2 has provided information on separate federal cases, which resulted in multiple search warrants and a federal indictment. CS#2 cooperated with law enforcement in return for monetary compensation. It should be noted that CS#2 is no longer in a position to report on subjects. A review of CS#2's criminal history included a conviction for domestic assault 4th degree. The information provided by CS#2 was corroborated through police reports, recorded controlled buys, physical surveillance, separate CS' and other investigative techniques.

24.     According to CS#2, "H" was selling fentanyl, but stopped around June of 2019 because he feared police investigations. CS#2 advised that the storefront operated by "H" at **Subject Property #1** is a small level convenience store, which also has an auto shop to work on cars. Also according to CS#2, there is a kitchen in the store where food is cooked and "H" has an office inside **Subject Property #1**. Furthermore, CS#2 reported to agents that "H" will cook up crack in the kitchen. CS#2 identified "H" from a photograph of HARVEY BUTLER. CS#2 knows BUTLER to always carry around a backpack and advised that BUTLER has an office inside **Subject Property #1**, and that narcotic customers who frequent **Subject Property #1** generally meet with BUTLER in his office inside **Subject Property #1**. CS#2 knew that BUTLER recently purchased a house in Afton, but CS#2 has never been to the house. Fixed surveillance identified that BUTLER routinely carries a bag (typically backpack or satchel) to and from **Subject Property #1**, which is believed to contain drugs and/or proceeds. Physical surveillance has corroborated that BUTLER will carry the bag or satchel from **Subject Property #2** to **Subject Property #1.** CS#2 knew BUTLER to be laundering his money through various businesses he creates. CS#2 also

12

reported that BUTLER had just opened a new store that "white mike" was helping to work on near Michigan Ave and Magnolia Ave in the city. CS#2 identified "white mike" from a photograph of MICHAEL SHEVLIN. CS#2 also informed investigators that BUTLER has a girl, identified as LAQUISHA JONES, who opened a clothing store "This n That[3]" in the area of MLK and N. Sarah St. to help launder drug proceeds. According to CS#2, JONES drives a blue BMW. CS #2 also corroborated CS#1's information regarding SHEVLIN and HALL.

25.     CS#2 informed agents that BUTLER was supplied with narcotics by individuals from Mexico. CS#2 also informed agents that he/she saw a Hispanic individual who visited **Subject Property #1** twice in July of 2019. Furthermore, CS#2 also witnessed a white female arrive at the shop. According to CS#2, once the Hispanic individual and the white female parked their cars in the garage of **Subject Property #1**, BUTLER helped the drivers remove the cocaine and heroin from the car. BUTLER then cut up the crack in the kitchen of **Subject Property #1**. CS#2 also informed investigators that BUTLER provided the Hispanic individual and the white female with a large amount of money. CS#2 does not know how much money, but knows there are multiple kilograms of narcotics moved from the car into the store.

26.     According to CS#2, during the week of July 21, 2019, a source of supply brought a delivery of cocaine and heroin to BUTLER at **Subject Property #1**. CS#2 further advised that there was a female driving the car that day. The car was a Lincoln with a Kansas plate 332MEM,

---

[3] Missouri Business records revealed "LAQUISHA N. JONES", 1600 Veronica Ave., St. Louis MO is the registered agent for "THIS AND THAT FASHION BOUTIQUE LLC". Physical surveillance observed the store is located at 4061 Dr. Martin Luther King Dr., St. Louis MO in the Newsome Plaza. LAQUISHA JONES is regularly at the **Subject Property #1** store with HARVEY BUTLER, and she has been identified as an employee of BUTLER's. JONES has also been present at three controlled buys during this investigation, and is also known to live at **Subject Property #3**.

according to CS#2. State DOR records revealed the KS plate registered to a MARIA I. COTA, 15215 W. 125th St. Olathe, KS 66062-4966 to a 2011 Silver Lincoln MKS.

27.     Between August and October of 2019, CS#2 was utilized by investigators to conduct four (4) additional controlled narcotics purchases from BUTLER at **Subject Property #1** to corroborate the information. The evidence seized in the controlled purchases tested positive for cocaine and totaled approximately 51.3 grams of crack cocaine. Before and after each controlled purchase, investigators searched CS#2, which yielded negative results on each occasion. Prior to each controlled purchase, CS#2 was provided with a covert audio/video recorder, and a covert audio transmitter. The following are summaries of the controlled buys which corroborate the information provided by CS#1 and CS#2.

28.     During the week of August 12, 2019, CS#2 met with investigators in anticipation of a controlled narcotic buy. Before the controlled buy, investigators provided CS#2 with $300 in U.S. currency, a covert audio/video recorder and an audio transmitter/recorder. In the presence of a UC, CS#2 placed a recorded call to BUTLER at (314) 285-9242. CS#2 recognized the voice on the phone to be that of BUTLER. BUTLER directed CS#2 to "…come on…" CS#2 knew BUTLER to be at his shop at 3400 Goodfellow Blvd (**Subject Property #1**). CS#2 knew the shop to be a convenience store, car wash, car dealership, and CS#2 also knew that there was a kitchen in back. Next, CS#2 was driven by a UC to **Subject Property #1**. CS#2 then exited the UC vehicle and met with BUTLER inside **Subject Property #1**. BUTLER was sitting at his desk in his office of **Subject Property #1**. CS#2 provided BUTLER with $300 while inside his office. BUTLER advised CS#2 to give him a minute. CS#2 exited the office and had general conversation while waiting in the store at **Subject Property #1**.  LAQUISHA JONES was present at the store and had

14

general conversation with CS#2. Then, BUTLER had CS#2 wait inside the store while he prepared the crack cocaine in the kitchen. After the narcotics cooled, CS#2 met with BUTLER in his office inside **Subject Property #1**. While in BUTLER's office, BUTLER provided CS#2 with one clear plastic bag of what CS#2 knew to be crack cocaine. CS#2 then exited **Subject Property #1** and entered the UC vehicle. CS#2 departed the area driven by the UC and met with investigators. Members of the investigative team followed the UC vehicle to a pre-determined location. CS#2 provided investigators with the suspected crack cocaine and the audio/video recording device.

29.     During the debrief with CS#2, CS#2 advised CS#2 went to the office inside **Subject Property #1** to see BUTLER. After BUTLER took the money, he asked CS#2 if CS#2 wanted it soft or hard. CS#2 knew "soft" to mean cocaine powder and "hard" to mean crack. CS#2 responded that it did not matter. CS#2 advised JONES was also present inside **Subject Property #1**. BUTLER proceeded to "whip it up" in the kitchen, according to CS#2. While inside the kitchen, BUTLER took what CS#2 knew to be cocaine from Zip-Loc bag. He mixed the cocaine with water in glass drums for 15 minutes in the microwave. He took it out of the microwave and let it dry in his office. After it dried, CS#2 met BUTLER in his office inside **Subject Property #1**. BUTLER then broke off a small piece of what CS#2 knew to be crack and placed it in clear plastic bag after which he gave it to CS#2. BUTLER told CS#2 he would give CS#2 "half for five." CS#2 knew this to mean BUTLER would charge CS#2 $500 for half an ounce of crack. CS#2's information was corroborated on the audio/video recorder. The suspected narcotics purchased during this controlled purchase were transported to the FBI St. Louis Division to be placed in the evidence control room. The suspected narcotics field-tested positive for the presence of cocaine and weighed approximately 8.4 grams

15

30.     The aforementioned controlled buy corroborated CS#2's information regarding BUTLER using his store at **Subject Property #1** to store and distribute crack cocaine. The video recording from that transaction showed BUTLER with a large amount of suspected cocaine that he used to cook the crack cocaine in his kitchen. The video further showed BUTLER in his office inside **Subject Property #1** with a large block of off-white rock substance (suspected crack cocaine). BUTLER took a small piece from it to provide to CS#2, which field tested positive for cocaine.

31.     On or about August 28, 2019, CS#2 met with investigators in anticipation of another controlled narcotic buy. An operational brief was conducted in anticipation of the controlled buy. Following the brief, members of the surveillance team departed the location to conduct surveillance in the area of **Subject Property #1.** CS#2 attempted to contact BUTLER at (314)285-9642, but the call was not answered. In the presence of investigators, CS#2 placed a call to LAQUISHA JONES at (321) 368-4928. Based off past experience, CS#2 knew the voice on the phone to be that of JONES. During the phone call, CS#2 advised JONES that he/she was trying to get a hold of BUTLER because he/she had some business for him. JONES told CS#2 that BUTLER was in a meeting and to try in about an hour. After the call was disconnected, CS#2 advised that BUTLER might be meeting with his source of supply. In the past, CS#2 knew that when BUTLER is in a "meeting," he was meeting with his source of supply, who supplied him with large amounts of cocaine.

32.     About an hour later, surveillance observed a black SUV Infiniti arrive at **Subject Property #1.** BUTLER exited the driver seat and entered **Subject Property #1**. A female, matching the description of JONES exited the passenger seat and entered **Subject Property #1**.

16

Investigators then provided CS#2 with $500 in U.S. currency, a covert audio/video recorder and an audio transmitter/recorder. CS#2, being driven by a UC, departed the staging location followed by members of the surveillance team. The UC parked at **Subject Property #1**, CS#2 exited the vehicle and entered **Subject Property #1**. CS#2 then met with BUTLER in his office inside **Subject Property #1**. Next, CS#2 provided BUTLER with $500 in exchange for a small clear plastic bag containing what CS#2 knew to be crack cocaine. CS#2 then exited **Subject Property #1** and entered the UC vehicle. CS#2 departed the area driven by the UC and met with investigators. At a pre-determined location, CS#2 provided investigators with the suspected crack cocaine and the audio/video recording device.

33.     During the debrief with CS#2, CS#2 advised that he/she walked into BUTLER'S office inside **Subject Property #1** and told BUTLER he/she had five, meaning $500. BUTLER then weighed a portion of what CS#2 knew to be crack cocaine for the CS, and then BUTLER gave CS#2 a small plastic bag of crack cocaine. CS#2 told BUTLER he/she had been trying to call him. BUTLER responded by telling CS#2, "You know I change my number all the time." BUTLER gave CS#2 his new flip phone. In order to identify the new number, CS#2 took BUTLER's flip phone and placed a call to his/her phone. By doing this, CS#2 identified BUTLER'S new phone number to be (314)370-9215.

34.     The suspected narcotics purchased during this controlled purchase were transported to the FBI St. Louis Division to be placed in the evidence control room. The suspected narcotics field-tested positive for the presence of cocaine and weighted approximately 14.1 grams.

35.     During the week of September 9, 2019, CS#2 again met with investigators in anticipation of a controlled narcotic buy. CS#2 then placed a telephone call to BUTLER at

17

(314)370-9215. During the call, CS#2 was directed by BUTLER to come to the shop, **Subject Property #1.** Investigators provided CS#2 with $500 in U.S. currency, an audio/video recorder and an audio transmitter/recorder to be used during the narcotic transaction. Following an operational brief, members of the surveillance team established surveillance in the area of **Subject Property #1**. CS#2 was driven by a UC to the area of **Subject Property #1** and walked into **Subject Property #1**. CS#2 entered **Subject Property #1** and met with BUTLER. During their meeting, CS#2 exchanged $500 with BUTLER in exchange for a small clear plastic bag containing what CS#2 knew to be crack cocaine. CS#2 exited the shop and walked back to the UC vehicle. CS#2 was driven by the UC to meet with investigators at a staging location. CS#2 provided investigators with the suspected crack cocaine and the audio/video recording device.

36.     The suspected narcotics purchased during the controlled buy were transported to the FBI St. Louis Division to be place dint eh evidence control room. The suspected narcotics field-tested positive for the presence of cocaine and weighted approximately 14.5 grams.

37.     During the week of September 30, 2019, CS#2 again met with investigators in anticipation of a controlled narcotic buy. During that meeting, investigators provided CS#2 with $500 in U.S. currency, an audio/video recorder and an audio transmitter/recorder to be used during the narcotic transaction. Following an operational brief, members of the surveillance team established surveillance in the area of **Subject Property #1**. CS#2 was then driven by a UC to the area of **Subject Property #1** and walked to **Subject Property #1**. Before entering **Subject Property #1,** CS#2 met with HARVEY BUTLER and his associate, "DUCHI," outside the auto shop.  CS#2 then walked through the open garage door into **Subject Property #1** with BUTLER. While inside, CS#2 provided BUTLER with $500 in exchange for what CS#2 knew to be crack

cocaine. CS#2 then exited the shop and walked back to the UC vehicle. CS#2 was driven by the UC to meet with investigators at a staging location. CS#2 provided investigators with the suspected crack cocaine and the audio/video recording device.

38.     The suspected narcotics purchased during the controlled buy were transported to the FBI St. Louis Division to be placed into the evidence control room. The suspected narcotics field-tested positive for the presence of cocaine and weighted approximately 14.3 grams.

39.     In November of 2019, members of the investigative team met with CS#3,[4] who had information on HARVEY BUTLER'S DTO. CS#3 knew a close associate of HARVEY BUTLER'S to be GRANT BERRY. According to CS#3, BERRY had been locked up recently. Investigators know GRANT BERRY to be a subject in a DEA investigation and corroborated his federal arrest. According to CS#3, prior to his arrest, BERRY was distributing narcotics out of BUTLER's car shop on Natural Bridge (O'Neals Elite Auto Sales LLC, 2639 Natural Bridge). CS#3 knew that BERRY's daughter, TIMICA SANDERS, once took phones that were left at the car shop to BUTLER. According to CS#3, the phones contained BERRY's source of supply who had direct ties to Mexico. CS#3 knew that BUTLER sells everything including cocaine, brown China, Gray China, tan, and fentanyl. CS#3 recognized a photograph of MICHAEL SHEVLIN. CS#3 did not know his name, but identified him as a "user" and knew him to work for BUTLER. According to CS#3, SHEVLIN got paid with narcotics. CS#3 knew SHEVLIN to do a one-on-one or speed ball which is heroin and cocaine.

---

[4] CS#3 was interviewed by investigators regarding the information they had about BUTLER. CS#3 was not in a position to work proactively with investigators, but the information provided by CS#3 was corroborated to the best extent possible and proved to be highly reliable.

40.     CS#3 knew BUTLER's shop to be right next to ANTONIO MORROW'S shop. BUTLER's shop is **Subject Property #1.** CS#3 knew BUTLER to have a bunch of expensive cars parked in the garage at the **Subject Property #1**. According to CS#3, BUTLER distributes narcotics out of **Subject Property #1**. CS#3 advised that MORROW is a source of supply of narcotics to the north side of St. Louis and BUTLER supplies the south side of St. Louis. According to CS#3, BUTLER deals with a bunch of older males.

41.     CS#3 knew that BUTLER used to have a two family flat on west Florissant and Pope (4425 Floriss Pl). According to CS#3, BUTLER would stay upstairs, but keep the narcotics downstairs in BUTLER's residence. CS#3 had not communicated with BUTLER since around March of 2019. It should be noted that the investigation revealed this was around the same time that BUTLER moved into **Subject Property #2.**

42.     Based on the investigative team's extensive training and experience, as well as my knowledge of this investigation, I believe that it is highly unlikely that **BUTLER** stores large quantities of controlled substances or proceeds of sales of controlled substances at his shop, **Subject Property #1**. The investigation has uncovered that there are several people who work and visit **Subject Property #1**. The shop is located in an area of St. Louis City, which is known to experience a high rate of crime. It is common for drug dealers to store larger amounts of narcotics and proceeds from their sales at separate locations. For example, drug dealers have been known to store drugs, proceeds and evidence of drug trafficking at stash locations to avoid detection from law enforcement and reduce risk for having people steal narcotics or proceeds. In the past, these stash locations have frequently been residences belonging to the subjects or their close associates.

43.     In this instant investigation, investigators received information from CS#1 that BUTLER used to live in north St. Louis on San Francisco Avenue, between Harris and Red Bud. CS#1 knew that BUTLER had moved to a house near Cherokee and Kingshighway (later identified **Subject Property #2**). CS#1 did not recall the exact location of the residence, but knew that the garage door did not close properly. CS#1 advised he/she knew that BUTLER had moved to that new residence, and CS#1 also told agents that he/she helped put T.V.s on the second floor apartment for BUTLER. CS#1 thought it was around the beginning of 2019 after the overdose death. CS#1 had been told by BUTLER that he moved residences because someone had robbed him and taken fifty grand and about half a key of cocaine from his house on San Francisco Avenue. A review of police reports revealed a SLMPD report from 2017, which documented that HARVEY BUTLER was identified as a victim of a burglary 2nd degree at his home address of 4206 E San Francisco Avenue, St. Louis MO. The report identified the witness as his spouse, LAQUISHA JONES. The report listed that a collection of watches and sunglasses had been stolen from BUTLER's bedroom.

44.     A second SLMPD report identified that on January 29, 2019, HARVEY BUTLER was a victim of assault 1st degree and property damage 1st degree at the same address, 4602 San Francisco Ave., St. Louis MO. That report further documented that police had been notified by the "shotspotter" system, which detected thirty four shots fired near 4210 E. San Francisco. BUTLER was home alone at the time of the incident. A review of BUTLER'S camera system captured the incident as detailed in the report, but BUTLER stated that he was unable to make a copy of the surveillance footage for evidence at the time of the incident. The burglary report corroborated that BUTLER had been a victim of a burglary. Based on the timing of these incidents, it appears that

21

BUTLER moved to **Subject Property #2** shortly after his residence was shot at multiple times**.** Utilities records corroborate that utilities for **Subject Property #2** have been in BUTLER's business name Neighborhood Convenience Services since February of 2019. Recent Surveillance of BUTLER has confirmed that he currently utilizes **Subject Property #2** as his primary residence.

45.     During this over year-long investigation, investigators have been able to access fixed surveillance video that shows the outside public parking lot to **Subject Property #1** in order to assist in the collection of evidence regarding BUTLER's drug trafficking. During this time period, fixed surveillance at **Subject Property #1** regularly observed BUTLER arrive at **Subject Property #1** driving various rental vehicles. BUTLER would regularly arrive during the morning hours and enter the store typically carrying a black backpack or a satchel. He would generally leave in the afternoon/evening hours with the black backpack or the satchel.  Based on extensive training and experience of members of the investigative team, I am aware that it is common for subjects of DTO's to use rental vehicles in furtherance of their drug trafficking operations. In the past, narcotics traffickers have used rental vehicles to transport narcotics, proceeds and other evidence of narcotic trafficking.

46.     In May of 2020, investigators spoke with another SLCPD CS (CS#4). CS#4 is an SLCPD CS. CS#4 has very limited access to BUTLER'S DTO. CS#4 is in a position to purchase user level amounts of crack, heroin, or weed from the BUTLER'S store at **Subject Property #1.** The information CS#4 has provided has been highly reliable. In the past, CS#4 has provided information on separate federal cases which resulted in multiple search warrants and a federal indictment. CS#4 cooperated with law enforcement in return for monetary compensation. A review of CS#4's criminal history revealed charges which included prostitution, possession of a controlled

22

substance, and tampering 1st with motor vehicle. The information provided by CS#4 was corroborated through controlled buys, physical surveillance, separate CS' and other investigative techniques.

47.     CS#4 told agents that he/she knew the store to be selling crack, heroin, and weed. CS#4 also told investigators that anybody could go into **Subject Property #1** and purchase crack, heroin, or weed from the people behind the register. CS#4 does not need to call, just show up, according to him/her. In the past, CS#4 knew two younger males would sell to CS#4. CS#4 does not know them, but refers to them as "B".

48.     On or about May 27, 2020, around 8:00AM, fixed surveillance observed a Jeep bearing Missouri license plate JE2T7P known to be driven by BUTLER arrive at **Subject Property #1**. BUTLER was then seen exiting the driver seat carrying a large black backpack into **Subject Property #1**. Later, that same day, physical surveillance was established at **Subject Property #1** in anticipation of a controlled narcotic purchase of crack cocaine from **Subject Property #1**. The Jeep was still parked, unoccupied at **Subject Property #1**. CS#4 was then provided with $100 to be used for the controlled buy. Prior to the controlled buy, CS#4 was searched with negative results and equipped with audio recording equipment, which was used to record the controlled buy. CS#4 was driven by a UC to the area of **Subject Property #1**. CS#4 exited the vehicle and entered the store at **Subject Property #1**. CS#4 was inside for only a few minutes before CS#4 was observed exiting the store. CS#4 exited the store and walked to the UC vehicle. CS#4 entered the UC vehicle and was followed by members of the surveillance team to a secure location. CS#4 provided investigators with a small clear plastic bag containing an off white rock-like substance which the CS knew to be crack cocaine.  The suspected crack-cocaine was

23

later transported to FBI St. Louis Division to be secured in the evidence control room. The narcotics had a pre-packaged weight of approximately .4 grams and field tested positive for the presence of cocaine.

49. During the debrief with CS#4 after the controlled buy, CS#4 advised that while inside the store, when CS#4 approached the register, there were two black females behind the counter at the register. CS#4 identified one from a photograph shown by investigators to be LAQUISHA JONES. There was also a skinny black male subject behind the counter. CS#4 looked at the male subject and told him he/she "got a dollar". Investigators know that "a dollar" means 100 dollars. According to CS#4, the male subject looked at JONES. JONES then nodded her head. CS#4 gave the $100 to the second unidentified female behind the register. CS#4 observed the female give the money to JONES. JONES and the skinny male subject then entered into an office behind the counter inside **Subject Property #1**. CS#4 could not see who was in the office. Based on previous information, previous controlled buys with CS#2, and also on the fact that BUTLER'S Jeep was parked at **Subject Property #1**, it is believed by investigators that BUTLER was likely inside the office. According to CS#4, JONES and the same male subject shortly exited the office. The male subject provided CS#4 with what the CS knew to be crack cocaine. JONES then directed the CS to go get a soda. CS#4 grabbed a soda and then exited the store.

50. Throughout this investigation, members of the investigative team conducted investigative techniques in an attempt to identify **Subject Property #2** utilized by HARVEY BUTLER. Based off of information provided by CS#1, investigators learned in June of 2020 the location was likely in neighborhood near Mardel. BUTLER'S rental Jeep bearing MO plate JE2T7P has been regularly observed since identifying the residence parked in the garage during

24

the late evening and early morning hours corroborating that BUTLER resides at **Subject Property #2**.

51.    On June 10, 2020, at approximately 0732 AM, the aforementioned Jeep bearing MO plate JE2T7P was parked in the garage at **Subject Property #2.** The garage door was open. Fixed surveillance conducted that same day later revealed that BUTLER arrived at **Subject Property #1** approximately an hour later at 8:27 AM. BUTLER exited the Jeep and entered **Subject Property #1** carrying a shoulder bag. Investigators are aware that subjects typically will store larger amounts of narcotics and proceeds at residences under there control and transport them to distribution locations to avoid detection.

52. On or about June 24, 2020, physical surveillance observed BUTLER's Jeep bearing MO license plate JE2T7P parked unoccupied in the garage at **Subject Property #2.** BUTLER exited the side door of **Subject Property #2** carrying a satchel. He entered the garage and shortly after that the Jeep departed driving east bound through the alley. The Jeep was driven directly to **Subject Property #1.** Upon arrival at **Subject Property #1,** BUTLER exited his car with the satchel and entered **Subject Property #1**.

53. Later that same day, on June 24, 2020, physical surveillance remained at **Subject Property #1** in anticipation of a controlled narcotic purchase of crack cocaine from **Subject Property #1**. The Jeep remained at **Subject Property #1** while investigators met with CS#4 at a staging location in anticipation of a controlled buy of heroin. CS#4 was provided with $100 to be used for the controlled buy. Prior to the controlled buy, CS#4 and his/her vehicle was searched with negative results, and CS#4 was equipped with audio recording equipment, which was used to record the controlled buy. CS#4 then departed the staging location followed by members of the

25

surveillance team to **Subject Property #1**. CS#4 exited the vehicle and entered the store at **Subject Property #1**. CS#4 was inside for only a few minutes before CS#4 was observed exiting the store. CS#4 exited the store, entered his/her vehicle and was followed by members of the surveillance team to a secure location. CS#4 provided investigators with a small clear plastic bag containing a white powdery substance which the CS knew to be heroin.  The suspected heroin was later transported to FBI St. Louis Division to be secured in the evidence control room. The narcotics had a pre-packaged weight of approximately .2 grams and field tested positive for the presence of heroin.

54.     During the debrief with CS#4, CS#4 advised that while inside the store, CS#4 approached the register, there was a middle aged black male with no front teeth at the register. CS#4 rubbed at his/her nose to indicate he/she wanted "boy" (known to investigators to mean heroin). CS#4 told the male subject he/she had a "dollar". CS#4 and investigators know this to mean they had $100. According to CS#4, the black male then reached underneath the counter and provided CS#4 with a small plastic bag of what the CS knew to be heroin in exchange for $100. The black male then asked CS#4 if he/she had any more money, CS#4 responded he/she didn't. CS#4 did not see BUTLER, but knows him to usually be in his office behind the counter. BUTLER's car was present and unmoved from the parking lot throughout the controlled purchase.

55.     The totality of this long-term investigation into BUTLER's DTO identified that BUTLER is likely operating a large scale drug trafficking operation in the greater St. Louis area. He is using his shop at **Subject Property #1** to distribute narcotics and launder proceeds and likely using **Subject Property #2** to store narcotics, proceeds, and evidence of drug trafficking as described in Attachment B. There is reason to believe that BUTLER maintains records of the

26

purchase, sale and maintenance of his business at the three locations. Such records would be evidence of money laundering.

56.    As part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime. I have had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking.  Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive distribution conspiracies involving large amounts of controlled substances and money, I am informed of the following:

a.    It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.    Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of controlled substances.  These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.    Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients.  The aforementioned

27

books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

   d.  Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in controlled substances or to facilitate such trafficking.  These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

   e.  Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances.  These traffickers frequently maintain these photographs in their residence or other buildings under their control.

   f.  Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

   g.  When drug traffickers amass large proceeds from the sale of controlled substances they attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their

28

attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.  They maintain record of these transactions in their residence or other buildings under their control.

h.      It is common for drug traffickers to travel to major distribution centers, such as Texas, California and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States.  After purchasing controlled substances, these drug traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.  Records of travel are frequently kept in their residence or other buildings under their control.

i.      Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

j.      Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine and/or United States currency.

## CONCLUSION

57.      Based on the foregoing I submit that this affidavit supports probable cause for a warrant to search the Premises described in Attachment A and seize the items described in Attachment B.

29

58. I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Megan Schira
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this ___30th___ day of June, 2020.

**/s/ David D. Noce**

The Honorable David D. Noce
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

*Property to be searched*

**Subject Property #1:** The property to be searched is the premises located at: 3400 Goodfellow Blvd. St. Louis, MO 63120, which is more fully described as a large auto shop building located on the east side of Goodfellow Blvd. There is a parking lot located to the north of the building. The building has a gray exterior with a red portion on the roof. There are multiple access points to the building, including multiple garage doors on the north side of the building and a door on the west side of the building with access to a small convenience store. Located on the north side of the building is the following: NEIGHBORHOOD AUTO SALES & SERVICES LLC 314-240-5950. Located on the west side of the building in large letters is NEIGHBORHOOD CONVEINIENCE L.L.C.





## ATTACHMENT B

*Property to be seized*

1.    All records and information relating violations of Title 21, United States Code, Sections 846 and 841(a)(1), unlawful use of a communication facility, in violation of Title 21, United States Code, Section 843(b), and money laundering, in violation of Title 18, United States Code, Section 1956 (hereafter "subject offenses"), that constitutes fruits, evidence and instrumentalities of violations those violations involving **HARVEY BUTLER** and occurring after **January 1, 2019**, including:

a.  Controlled substances;

b.  Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

c.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

d.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

e.  Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

f.  Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

g.  United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

h.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

i.  Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

j.  Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

k.  Firearms and/or weapons.